## Whitaker v. Million et al.

(Decided Nov. 29, 1932.)

ROSS & ROSS for appellant.

CHENAULT & JACKSON for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

The appeal is from a judgment enjoining the use of a passway by the appellant, F. J. Whitaker, over the property of the appellees, A. J. Million and wife. The claimed passway leads from appellant's farm southeastwardly across appellee's farm, passing by the dwelling and barns, thence down a lane owned by the appellee in fee, to the "Mule Shed lane," or Newby road. Before 1902, the two farms were in one body. In that year Whitaker bought about 98 acres of the northeastern part of that tract and built a house on the ridge, in which he has since lived. The proof is that from the beginning he and all who had occasion to go to and from his place traveled through a gate and down the ridge across the remainder of the original tract, now owned by the appellee, in order to get to the

Newby road, which led to his church and school. But until 1908 it appears that this road somewhere along the way turned south or southeasterly down the hill on appellees' land to what is called the Joel Barnes Branch road, thence to the Newby road. The preponderance and best evidence is that this route was used for forty or fifty years.

In 1908 Smith, who then owned the Million farm, purchased a sixteen-foot strip in fee from a neighbor on the southwest, R. E. Tudor, and from that time Whitaker's family and others went straight through this lane instead of going down the hill to the Branch road. For twelve or fifteen years Whitaker's mail box has been at the mouth of the lane. Whitaker testifies that before this strip was thus acquired he traveled ''along side it''; and Smith says he went that way by permission of Tudor. We think it is clear, however, there was then no right of way along the route of the present lane. But, whatever way he may have had, it is certain that the new lane was substituted for it. Bright v. Dunn (Ky.) 15 S. W. 7, 779, 12 Ky. Law Rep. 689.

Extending back in the other direction, the evidence shows that the public passed through Whitaker's land and to the east or northeast, across what is called the Billy Tudor place, to the Crutcher pike, or down the hill on Whitaker's land southeastwardly to the Barnes Branch road, thence to the Crutcher pike. This route down the hill to that Branch road and thence in either direction to the respective pikes is a way out for the appellant so that the claim of a road of necessity is not proven. However, it is very precipitous and rocky, the greater part being in a creek bed, and is impassable in high water and freezing weather. It is dangerous at all times. It seems also that the appellant has another way out across his farm to the Honest branch road. That he has a way out, however, is immaterial. Ray v. Nally, (Ky.) 89 S. W. 486, 28 Ky. Law Rep. 421; Carter v. Shrout, 185 Ky. 729, 215 S. W. 808.

There is really no effective contradiction in the evidence relating to the use of the route in question in connection with appellant's farm. The difficult issue is as to whether this was and continued to be a permissive use only or there exists a prescriptive right. It is a well-established rule that, where there has been a continuous, uninterrupted use of a passway for fifteen

years and more, the burden is upon the party denying the right to prove that it was used only by consent or permission. Casey v. Hensley, 53 S. W. (2d) 698, 245 Ky. 330, and cases cited therein.

Smith, who sold Million his farm in 1914, owned and lived on it for about ten years. When he acquired the lane in 1908, he says Whitaker offered to pay part of its cost, but he declined the offer as he wanted to have full control over it. Whitaker denies this. Be that as it may, Smith says that Whitaker went through the lane without asking his permission. He testified: "I suppose he had a right if he wanted to. I never did tell him not to." In the spring following the purchase of the lane, some one coming through one night ran over his garden, and Smith asked Whitaker about putting a lock on the gate between their farms, and Whitaker said he had rather not because it might hurt somebody's feelings. Whitaker suggested that he put a lock upon the gate between his barn lot and the lane. This was done, and Smith gave Whitaker a key. The gate remained with the lock on it for two or three months, when Smith took it off. It will be observed that this was twenty-two years or more before this litigation, and we think it reasonable to conclude that Smith then conceded Whitaker's right to travel over the passway.

The appellee has never lived on the farm. He testifies that after he bought it Whitaker asked permission to pass through his place, especially for his children in going to school, and promised he would help keep up the road, and stated at the time that he did not want to make it a public passway. He consented to this use by Whitaker and his family, with the specific understanding that he could withdraw that permission when he pleased. He did call on the neighbors to work the road, and Whitaker worked one day. The appellant emphatically denies this conversation. He says that he and others worked on the lane several times. Million says that eight or nine years ago he had the gate wired up, but it was cut open. Then about 1925 it was again wired up and signs placed at either end that the passway was closed. This was probably the time when he says he told Whitaker he was going to sell his farm and had been asked by several whether there was a passway over it and he told them there was not and

informed Whitaker of his purpose to wire up the gate. He says Whitaker responded: "I hate to see you stop it." Whitaker denies this conversation also, and says Million told him he had sold to Mrs. Tudor and that she was going to stop up the road, and he replied that he would go through until the law stopped him. According to appellee, the gate remained wired for several months and until Whitaker's daughter secured permission to go through to the school where she was teaching. The length of time it remained fastened is contradicted by witnesses who seem to have had a better opportunity to know the situation. The daughter denies asking such permission. Some two or three years before the litigation started, Million charged Whitaker with cutting the wire from the gate, and the latter replied that he would continue to do that and the only way to stop him was by law. The testimony of Whitaker is that in 1925, when the wate was thus wired, it remained fastened only a few days, during which he had no occasion to pass through. When he did, he opened it up. Compare Prewitt v. Houstonville Cemetery Company (Ky.) 101 S. W. 892, 31 Ky. Law Rep. 125.

The evidence for the appellant is to the effect that he was claiming at all times the right to use this passway. He was at least denying Million's right to close it, for whenever an attempt was made he promptly opened up the gate and continued to travel over the passway. In this he is corroborated by his adult son, who seems to have kept a memorandum of the efforts to obstruct the passway. The first time was in December, 1925; the second, May 11, 1929; and again on September 3, 1929, May 14, 1930, September 2 and 4, 1930. There is no dispute that, shortly before this suit was filed by Million to enjoin trespass, he had the gate fastened and the passway obstructed two or three times and that Whitaker unfastened the gate and removed the obstructions under a claim of right. There is some other evidence in the record, but the foregoing is the most material and substantial.

We think the evidence insufficient to prove that the use of this passway was merely permissive. It is an outstanding fact that all attempts to prevent the use of it were resisted by the appellant in such a way as to bring home to the appellee that he was claiming the

passway as a matter of right. All of these efforts were made after Whitaker had been using the entire route for twenty years or more. We see quite a similarity to this case in Brookshire v. Harp, 186 Ky. 217, 216 S. W. 379, in which it was held a passway existed.

Our conclusion, therefore, is that the judgment should have gone for the defendant.

The judgment is reversed, with directions to enter judgment in conformity with the opinion.